IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE:  REFINED PETROLEUM PRODUCTS ANTITRUST LITIGATION | § This Document Relates To: <br> § <br> § CIVIL ACTION NOS. <br> § H:07-MDL-01886 <br> § H:06-CV-03569 <br> § H:07-CV-04409 <br> § H:07-CV-04413 <br> § H:07-CV-04415 <br> § H:08-CV-00241 <br> § H:08-CV-02745 <br> § |

## MEMORANDUM OPINION AND ORDER

Pending before the court is Served Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Memorandum in Support ("Defendants' Motion to Dismiss," Docket Entry No. 106 in Civil Action H-06-03569, Docket Entry No. 136 in Civil Action H-07-04409, Docket Entry No. 115 in Civil Action H-07-04413, Docket Entry No. 60 in Civil Action H-07-04415, and Docket Entry No. 53 in Civil Action H-08-00241). For the reasons stated below the court will grant the defendants' motion and dismiss the above-listed actions that have been consolidated for pretrial purposes.

## I.  Background

Plaintiffs seek to hold certain companies liable for treble damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for conspiring with members of the Organization of Petroleum Exporting Countries (OPEC) and others in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## A.   Orders for Consolidation

On December 18, 2007, the United States Judicial Panel on Multidistrict Litigation issued a Transfer Order (Docket Entry No. 1 in H-07-MDL-01886) that consolidated five civil actions pending in four judicial districts for purposes of pretrial proceedings pursuant to 28 U.S.C. § 1407: S-Mart Petroleum, Inc. v. Petroleos de Venezuela, S.A., et al., Civil Action No. 1:07-1179 pending in the District of Columbia; Fast Break Foods, LLC v. Saudi Arabian Oil Co., et al., Civil Action No. 1:06-6594, and Green Oil Co. v. Saudi Arabian Oil Co., et al., Civil Action No. 1:07-3617 pending in the Northern District of Illinois; Countywide Petroleum Co. v. Petroleos de Venezuela, S.A., et al., Civil Action No. 1:07-1632 pending in the Northern District of Ohio; and Spectrum Stores, Inc., et al. v. Citgo Petroleum Corp., Civil Action No. 4:06-3569 pending in the Southern District of Texas.  On December 27, 2007, the United States Judicial Panel on Multidistrict Litigation issued a Conditional Transfer Order (Docket Entry No. 2 in H-07-MDL-01886) pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 535-36 (2001), pursuant to which Central Ohio Energy, Inc. v. Saudi Arabian Oil Co., et al., Civil Action No. 1:07-6462 pending in the Northern District of Illinois was consolidated with the above-listed actions for purposes of pretrial proceedings.  The consolidated actions

> share factual questions relating to allegations that
> several entities, either as defendants or co-conspirators
> in various actions, violated antitrust laws by conspiring
> to fix, maintain and/or stabilize the price of refined
> petroleum products (such as gasoline, kerosene, heating
> fuel, lubricants and other products) in the
> United States.[1]

On March 21, 2008, S-Mart Petroleum, Inc. filed a Notice of Voluntary Dismissal Without Prejudice (Docket Entry No. 24 in Civil Action No. H-07-04434), pursuant to which the court entered an Order of dismissal (Docket Entry No. 25) on March 24, 2008.

A suit filed by John Gokey against CITGO Petroleum Corporation (CITGO) in the Justice of the Peace Court of Dallas County, Texas, Case No. JS-08-00197H, which was removed to the federal court in the Northern District of Texas (Case Number 3:08cv1095) and transferred to this court, has also been consolidated because the Statement of Claim therein seeks to hold CITGO liable for "[b]eing part of OPEC" pursuant to the Sherman and Clayton Acts.[2]  Because briefing on the defendants' motion to dismiss concluded before this transfer, pursuant to the court's September 11, 2008, Order (Docket Entry No. 8 in Civil Action No. H-08-02745), Gokey received twenty days in which "to present any additional factual or legal arguments related to his action,"[3] but has presented no additional arguments.

---

[1]Transfer Order, p. 1 (Docket Entry No. 1 in H-07-MDL-01886).

[2]See Docket Entry No. 1 in Civil Action No. H-08-02745.

[3]Although the order extending the briefing deadline for John Gokey did not expressly consolidate Gokey's action for all pretrial proceedings, the MDL Order is sufficiently broad in scope to include the Gokey action.

**B.   Live Complaints**

There are three live complaints before the court:   (1) the Spectrum Complaint originally filed in this district on November 13, 2006 ("Spectrum Complaint," Docket Entry No. 1 in H-06-03569); (2) the Amended and Consolidated Class Action Complaint filed on February 8, 2008 ("Consolidated Complaint," Docket Entry No. 131 in H-07-04409; Docket Entry No. 110 in H-07-04413; Docket Entry No. 52 in H-07-04415; and Docket Entry No. 48 in H-08-00241); and (3) the Statement of Claim filed in the Justice of the Peace Court in Dallas County, Texas, on June 5, 2008, and removed to the Federal District Court for the Northern District of Texas on June 30, 2008, and an amendment thereto submitted to this court on September 30, 2008 ("Gokey Statement of Claim," Docket Entry Nos. 1 and 9 in Civil Action No. H-08-02745).

The Spectrum Complaint initially filed in this action names CITGO as the sole defendant and includes three counts that emanate from CITGO's alleged involvement "in a conspiracy among the members of . . . OPEC . . ., an admitted price-fixing cartel, to raise, fix, and stabilize the price of gasoline and other oil-based products in the United States."[4]   The first count seeks to hold CITGO liable for its agreement to participate in "OPEC's price-fixing conspiracy to sell oil-based products at anticompetitive prices in the United States."[5]   The second and third counts seek to

---

[4]Spectrum Complaint, p. 1 ¶ 1.

[5]Id. at 25-26 ¶¶ 77-79.

hold CITGO liable for agreeing to assist its parents, including Venezuela, in participating in OPEC.[6]

The Consolidated Complaint asserts a single claim under Section 1 of the Sherman Act against CITGO, its corporate parent Petroleos de Venezuela, S.A. ("PDVSA") and its other subsidiaries, and two other vertically integrated producers of refined petroleum products (RPPs): Saudi Arabian Oil Co. ("Saudi Aramco") and OAO Lukoil ("Lukoil"), and their parents, affiliates, and subsidiaries in the chain of RPP production and distribution to the United States market.[7] The Consolidated Complaint alleges that

> [d]efendants engaged in an unlawful continuing contract, combination and conspiracy in restraint of trade in violation of the Sherman Act to increase the price of RPPs sold in the United States to members of the [c]lass.
>
> . . . Defendants and their co-conspirators agreed to restrain the output and thereby fix the price of crude oil with the knowledge and intent that doing so would fix and increase the price of RPPs, thereby producing supra-competitive profits from the sale of RPPs in the United States.[8]

The Consolidated Complaint seeks declaration that the alleged conspiracy constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, treble damages, a permanent injunction ordering Saudi Aramco, PDVSA, and Lukoil to

---

[6]Id. at 26-27 ¶¶ 80-85.

[7]Consolidated Complaint at 8-12 ¶¶ 21-39.

[8]Id. at 15 ¶¶ 51-52.

-5-

divest their United States subsidiaries, costs of suit, and attorneys' fees.[9]

The Gokey Statement of Claim seeks to hold CITGO liable for "[b]eing part of OPEC" pursuant to the Sherman and Clayton Acts.[10] An amendment requested thereto seeks to increase the amount of damages sought to two billion dollars.[11]

## II.  <u>Served Defendants' Motion to Dismiss</u>

On April 11, 2008, the served defendants filed their pending Motion to Dismiss.  Defendants argue that they are entitled to dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because plaintiffs' claims pose non-justiciable political questions, and that they are entitled to dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) because plaintiffs' claims are precluded by (1) the act of state doctrine, (2) the international comity doctrine, (3) the indirect purchaser doctrine, and (4) the <u>Noerr-Pennington</u> Doctrine.[12]

---

[9]<u>Id.</u> at 28-29.

[10]Docket Entry No. 1 in Civil Action No. H-08-02745.

[11]Docket Entry No. 9 in Civil Action No. H-08-02745.

[12]Pursuant to this court's January 23, 2008, Order, the pending motion addresses five issues of law common to all the complaints: (1) the political question doctrine, (2) the act of state doctrine, (3) the international comity doctrine, (4) the indirect purchaser doctrine, and (5) the <u>Noerr-Pennington</u> Doctrine.

**A.    Standard of Review**

When a Rule 12(b)(1) motion is filed together with other Rule 12 motions, the court should address the jurisdictional attack before addressing any attack on the merits.  <u>Ramming v. United States</u>, 281 F.3d 158, 161 (5th Cir. 2001), <u>cert. denied sub nom. Cloud v. United States</u>, 122 S.Ct. 2665 (2002) (citing <u>Hitt v. City of Pasadena</u>, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam) ("Dismissal . . . for failure to state a claim is a decision on the merits . . . whereas a dismissal on jurisdictional grounds alone is not on the merits.")).  Plaintiffs argue that defendants' motion to dismiss should not be treated as a challenge to the court's jurisdiction under Rule 12(b)(1) but, instead, as a request for dismissal for failure to state a claim under Rule 12(b)(6). Because the court will grant defendants' motion based on application of the act of state doctrine and, alternatively, on application of the political question doctrine, the court need not decide the correct standard of review for all of the defendants' arguments.  Nevertheless, the court must define the standard of review for the two arguments that it finds to be dispositive.

1.    <u>Rule 12(b)(1)</u>

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." <u>Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.</u>, 143 F.3d 1006, 1010 (5th Cir.

1998).  In examining a Rule 12(b)(1) motion the district court is empowered to consider matters of fact that may be in dispute. "Lack of subject matter jurisdiction may be found in any one of three instances:  (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Ramming, 281 F.3d at 161 (citing Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996)).  "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." Id.  Dismissal on jurisdictional grounds alone is not on the merits. Hitt, 561 F.2d at 608.

    2.   Rule 12(b)(6)

    Federal Rule of Civil Procedure 12(b)(6) allows dismissal if a plaintiff fails to state a claim upon which relief may be granted.  In Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007), the Court clarified the standard applicable to Rule 12(b)(6) motions to dismiss Sherman Act claims by confirming that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Acknowledging that material allegations must be accepted as true and construed in the light most favorable to the nonmoving party, the Court nevertheless held that complaints in which plaintiffs

-8-

have failed to plead enough facts to state a claim that is at least plausible on its face may be dismissed for failure to state a claim. Id. at 1973-74. The Court explained that courts are not required to accept conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with two exceptions. In Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498-99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of certain documents the defendant attached to a motion to dismiss. The Fifth Circuit has "restricted such consideration to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." Scanlan v. Tex. A & M Univ., 343 F.3d 533, 536 (5th Cir. 2003). Courts may also refer to matters of public record when deciding a Rule 12(b)(6) motion. Norris v. Hearst Trust, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing Cinel v. Connick, 15 F.3d 1338, 1343 n.6 (5th Cir.), cert. denied, 115 S.Ct. 189 (1994)).

3.   The Proper Standard of Review

Citing Hanson v. Town of Flower Mound, 679 F.2d 497 (5th Cir. 1982), and Baker v. Carr, 82 S.Ct. 699 (1962), plaintiffs argue that the court should consider all the defendants' arguments based solely on the complaints and the law and should not consider extra-pleading materials that have been submitted in support thereof.

Alternatively, plaintiffs seek the ability to depose the affiants of any extra-pleading materials the court considers in ruling on the pending motion and urge the court to rule on the defendants' jurisdictional challenge only after conducting an evidentiary hearing.[13]  Citing <u>Lane v. Halliburton</u>, 529 F.3d 548, 565 (5th Cir. 2008), defendants argue that "[i]nvocation of the political question doctrine implicates the district court's jurisdiction."[14]

In <u>Baker v. Carr</u>, 82 S.Ct. at 698-99, the Supreme Court distinguished dismissals for lack of subject matter jurisdiction from dismissals for failure to state a justiciable cause of action. The Supreme Court explained that

> [i]n the setting of a case such as this, the recited grounds embrace two possible reasons for dismissal:
>
> First:  That the facts and injury alleged, the legal bases invoked as creating the rights and duties relied upon, and the relief sought, fail to come within that language of Article III of the Constitution and of the

---

[13]Plaintiffs' Opposition to Served Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim and Memorandum in Support ("Plaintiffs' Opposition," Docket Entry No. 128 in H-06-03569, Docket Entry No. 159 in H-07-04409, Docket Entry No. 138 in H-07-04413, Docket Entry No. 82 in H-07-04415, and Docket Entry No. 77 in H-08-00241), p. 9.

[14]Served Defendants' Reply Memorandum in Support of the Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim ("Defendants' Reply," Docket Entry No. 45 in H-07-MDL-01886), p. 1.  Defendants also cite the unpublished Memorandum Opinion and Order issued in <u>Smith v. Halliburton Co.</u>, Civil Action No. H-06-0462, 2006 WL 2521326, at *7 (S.D. Tex. Aug. 30, 2006), in support of their argument that the court should analyze their motion to dismiss based on the political question doctrine under Rule 12(b)(1).  However, that case is inapposite because the standard of review was not in dispute.

jurisdictional statutes which define those matters concerning which United States District Courts are empowered to act;

Second: That, although the matter is cognizable and facts are alleged which establish infringement of appellants' rights as a result of state legislative action departing from a federal constitutional standard, the court will not proceed because the matter is considered unsuited to judicial inquiry or adjustment. We treat the first ground of dismissal as "lack of jurisdiction of the subject matter." The second we consider to result in a failure to state a justiciable cause of action.

Id.  See also Powell v. McCormack, 89 S.Ct. 1944, 1959 (1969) (distinguishing dismissals for lack of subject matter jurisdiction from dismissals for failure to state a justiciable claim).

In Hanson, 679 F.2d at 503 n.8, the Fifth Circuit cited Baker, 82 S.Ct. at 698-99, as holding that "dismissals for lack of a justiciable question are properly treated as dismissals for failure to state a claim."  Although defendants have correctly observed that in Lane, 529 F.3d at 565-66, the Fifth Circuit referenced Rule 12(b)(1) in relation to the statement that "[i]nvocation of the political question doctrine implicates the district court's jurisdiction," this statement does not support their contention that defendants' arguments based on the act of state doctrine and the political question doctrine should be analyzed under Rule 12(b)(1) instead of Rule 12(b)(6).  In Lane the Fifth Circuit expressly premised its analysis of the political question issue on Twombly, 127 S.Ct. at 1965-66, a case in which the Supreme Court addressed only the standard of review applicable to Rule 12(b)(6)

-11-

motions.    Accordingly,  the  court  concludes  that  defendants'
arguments  that  the  plaintiffs'  claims  are  subject  to  dismissal
because they pose non-justiciable political questions and because
they are barred by the act of state doctrine should be reviewed
under Rule 12(b)(6).

## B.    Analysis

Each of the live complaints seeks treble damages and
injunctive relief under Sections 4 and 16 of the Clayton Act, 15
U.S.C. §§ 15 and 26, against defendants for conspiring with foreign
sovereigns, including the foreign sovereign members of OPEC, to fix
the price of RPPs in the United States in violation of Section 1 of
the Sherman Act, which provides that "[e]very contract, combination
in the form of trust or otherwise, or conspiracy, in restraint of
trade  or  commerce  among  the  several  States,  or  with  foreign
nations, is declared to be illegal."  15 U.S.C. § 1.  To establish
liability plaintiffs must prove, inter alia, (1) "[t]hat there was
a combination or conspiracy between the defendants to fix the price
of [RPPs in the United States, and] (2) [t]hat the combination or
conspiracy constituted  an  unreasonable  restraint  on  interstate
[and/or foreign] commerce."[15]  See Nash v. United States, 33 S.Ct.
780, 782 (1913) (§ 1 of the Sherman Act prohibits joint plan to
restrain trade).  An antitrust

_____

[15]Fifth Circuit Pattern Jury Instruction (Civil) § 6.1 (2006).

-12-

combination or conspiracy is formed when two or more
persons knowingly join together to accomplish some
unlawful purpose by joint action.   A person acts
knowingly if he acts voluntarily and intentionally, and
not by mistake or accident.  The essence of a conspiracy
is an agreement between two or more persons to violate or
disregard the law.  This does not mean that the members
of an alleged conspiracy must enter into any [express or]
formal agreement.  The required combination or conspiracy
may be established by showing that the defendant(s)
knowingly came to a common and mutual understanding to
accomplish or attempt to accomplish an unlawful purpose.
A conspiracy cannot be formed unless at least two
separate persons or corporations reach an agreement or
understanding.   A single corporation cannot agree,
combine or conspire with its own officers or employees.

                            . . .

     . . . A price fixing conspiracy may consist of any
agreement or arrangement or understanding between two or
more competitors, knowingly made, to sell at a uniform
price, or to raise, lower or stabilize prices.  There is
a price fixing conspiracy and an unreasonable restraint
on interstate [or foreign] commerce in violation of the
anti-trust laws if (1) there is a common plan or
understanding, (2) knowingly made, or arranged, or
entered into, (3) between two or more competitors,
(4) who are engaged in interstate [or foreign] trade or
commerce, (5) to adopt or follow or adhere to any price
formula that results in raising, or lowering, or
maintaining at fixed levels prices charged for goods or
services sold in interstate trade or commerce.[16]

Stating a claim for restraint of trade under the Sherman Act

requires plaintiffs to allege enough factual matter, taken as true,

to suggest that an agreement was made; bare assertions of

conspiracy do not suffice to state a claim under the Sherman Act.

See Twombly, 127 S.Ct. at 1965-66.

---

[16] Id.

                            -13-

1.   <u>Act of State Doctrine</u>

Asserting that "[t]he act of state doctrine bars claims that require a U.S. court to inquire into the validity of a foreign nation's sovereign acts,"[17] defendants argue that the claims alleged in the live complaints are barred because they "attack as unlawful the crude oil production decisions of individual OPEC Member States and the Russian Federation."[18]  Defendants explain that

> [r]egardless of window-dressing in the complaints, plaintiffs cannot escape the fact that to succeed they must prove the existence of an unlawful conspiracy among sovereign nations.  The alleged acts of conspiracy are the individual decisions of OPEC Member States and other oil-producing states on crude oil production levels and any purported agreements among them on the subject.  In order to find for plaintiffs, therefore, the Court would have to conclude that the public acts of these sovereign nations are unlawful. . .
>
> . . .
>
> The complaints attempt to divert attention from the actions of the sovereign states by claiming that Lukoil, CITGO, Motiva, and other defendants joined the OPEC "conspiracy." But to adjudicate such a claim, this Court must necessarily determine the legality of public acts taken by the sovereign members of OPEC within their sovereign territories.  Put another way, such an inquiry perforce requires this Court to determine that there was an illegal antitrust conspiracy among sovereign nations . . . That is precisely the judicial inquiry that the act of state doctrine prohibits.[19]

---

[17]Defendants' Motion to Dismiss at 24.

[18]<u>Id.</u> at 28.

[19]<u>Id.</u> at 28 and 29.

Plaintiffs counter that they

do *not* ask this [c]ourt to declare invalid the "crude oil production decisions" made by any foreign sovereign government within its own borders. Plaintiffs ask the [c]ourt to declare unlawful the participation and utilization of non-sovereign entities in a conspiracy that includes the active involvement of companies located here in the United States, that seeks to capture profits from RPP sales made here in the United States, and that goes far beyond simply profiting from the sale of crude oil as a result of sovereign "crude oil production decisions." Because plaintiffs' claims can be granted in full without requiring this Court to declare invalid the sovereign act of any nation within its own borders, the act of state doctrine does not apply.

To the extent plaintiffs' claims implicate the acts of foreign nations, they fall within two different exceptions to the act of state doctrine. The doctrine does not apply to conduct that is taken outside the territory of the foreign sovereign in question or to conduct that is commercial [in] nature. Both of those exceptions apply here, making the doctrine wholly inapplicable.[20]

    (a)  Applicable Law

As articulated by the United States Supreme Court in <u>Underhill v. Hernandez</u>, 18 S.Ct. 83 (1897), and most recently reaffirmed in <u>W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.</u>, 110 S.Ct. 701 (1990), the act of state doctrine provides that "the act within its own boundaries of one sovereign State . . . becomes . . . a rule of decision for the courts of this country."  <u>Id.</u> at 705 (quoting <u>Banco Nacionale de Cuba v. Sabbatino</u>, 84 S.Ct. 923, 940-41 (1964)).

---

[20]Plaintiffs' Opposition, pp. 22-23.

In <u>Underhill</u>, 18 S.Ct at 83, a United States citizen sought damages from the revolutionary leader of Venezuela for denying him a passport.  Reasoning that

> [e]very sovereign state is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory[, and that r]edress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves,

<u>id.</u> at 84, the Court upheld the lower courts' dismissal of plaintiff's complaint because the facts before the court established that "the acts complained of were the acts of a military commander representing the authority of the revolutionary party as a government, which afterwards succeeded, and was recognized by the United States." <u>Id.</u> at 85.  Thus, the rule stated in <u>Underhill</u> — often referred to as the act of state doctrine — embodies three requirements, i.e., this rule may be applied only to acts that are (1) governmental acts (2) undertaken by a recognized sovereign (3) within its own territory.

<u>Kirkpatrick</u>, 110 S.Ct. at 701, involved bribes paid to acquire a construction contract in Nigeria.  Harry Carpenter, the chief executive officer of W.S. Kirkpatrick & Co. (Kirkpatrick), learned that the Republic of Nigeria was interested in contracting for a medical center.  Carpenter arranged for a Nigerian citizen to secure the contract for Kirkpatrick in exchange for a "commission" that would be used to bribe Nigerian officials.  After the contract was awarded to Kirkpatrick, an unsuccessful bidder, Environmental

Tectonics, learned of the bribes and complained not only to the
Nigerian government but also to the United States Embassy in Lagos.
Following an investigation by the Federal Bureau of Investigation,
the United States Attorney for the District of New Jersey brought
charges against Carpenter and Kirkpatrick under the Foreign Corrupt
Practices Act of 1977, 15 U.S.C. § 78dd-1 et seq., and both pleaded
guilty.   Environmental Tectonics then brought suit against
Kirkpatrick under various federal laws.   Kirkpatrick moved to
dismiss on the ground that the action was barred by the act of
state doctrine.   Id. at 702-03.   Agreeing that the act of state
doctrine applied

> to the facts at hand, the [district] court held that
> [Environmental Tectonics'] suit had to be dismissed
> because in order to prevail [Environmental Tectonics]
> would have to show that "the defendants or certain of
> them intended to wrongfully influence the decision to
> award the Nigerian Contract by payment of a bribe, that
> the Government of Nigeria, its officials or other
> representatives knew of the offered consideration for
> awarding the Nigerian Contract to Kirkpatrick, that the
> bribe was actually received or anticipated and that 'but
> for' the payment or anticipation of the payment of the
> bribe, [Environmental Tectonics] would have been awarded
> the Nigerian contract."

Id. at 703 (quoting Environmental Tectonics Corp., Intern. v. W.S.
Kirkpatrick & Co., Inc., 659 F.Supp. 1381, 1393 (D.N.J. 1987)).

The Third Circuit Court of Appeals reversed, holding that
application of the act of state doctrine was not warranted.   The
Third Circuit rested its opinion on a letter the district court had
received from the United States Department of State stating that
"judicial inquiry into the purpose behind the act of a foreign

-17-

sovereign would not produce the 'unique embarrassment, and the particular interference with the conduct of foreign affairs, that may result from the judicial determination that a foreign sovereign's acts are invalid.'" Id. at 704 (quoting Environmental Tectonics Corp., Intern. v. W.S. Kirkpatrick & Co., Inc., 847 F.2d 1052, 1061 (3d Cir. 1988)).

> In light of the [State] Department's view that the interests of the Executive Branch would not be harmed by prosecution of the action, the Court of Appeals held that Kirkpatrick had not met its burden of showing that the case should not go forward; accordingly, it reversed the judgment of the District Court and remanded the case for trial.

Id.

Acknowledging that the jurisprudential foundation for the act of state doctrine had evolved over time, the Supreme Court concluded that the factual predicate for application of the act of state doctrine did not exist because

> [r]egardless of what the court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit, and there is thus no occasion to apply the rule of decision that the act of state doctrine requires.

Id. at 705.  Citing Underhill, 18 S.Ct. at 85, the Court explained

> [i]n every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory. . . In the present case, by contrast, neither the claim nor any asserted defense requires a determination that Nigeria's contract with Kirkpatrick International was, or was not, effective.
>
> Petitioners point out, however, that the facts necessary to establish respondent's claim will also establish that

-18-

the contract was unlawful.  Specifically, they note that
in order to prevail respondent must prove that petitioner
Kirkpatrick made, and Nigerian officials received,
payments that violate Nigerian law, which would, they
assert, support a finding that the contract is invalid
under Nigerian law.  Assuming that to be true, it still
does not suffice.  The act of state doctrine is not some
vague doctrine of abstention but a "*principle of decision*
binding on federal and state courts alike." . . .  As we
said in <u>Ricaud [v. American Metal Co.</u>, 38 S.Ct. 312, 314
(1918),] "the act within its own boundaries of one
sovereign State . . . becomes . . . a rule of decision
for the courts of this country." . . .  Act of state
issues only arise when a court *must decide* — that is,
when the outcome of the case turns upon — the effect of
official action by a foreign sovereign.  When that
question is not in the case, neither is the act of state
doctrine.  That is the situation here.

<u>Id.</u> at 704-05.

Nevertheless, the <u>Kirkpatrick</u> Court acknowledged that

in <u>Sabbatino</u> . . . we observed that sometimes, even
though the validity of the act of a foreign sovereign
within its own territory is called into question, the
policies underlying the act of state doctrine may not
justify its application.  We suggested that a sort of
balancing approach could be applied — the balance
shifting against application of the doctrine, for
example, if the government that committed the 'challenged
act of state' is no longer in existence. . . 84 S.Ct. at
940.

<u>Id.</u> at 706.  Thus, even if the conditions for application of the

act of state doctrine articulated in <u>Underhill</u> and <u>Kirkpatrick</u>

exist, the court must decide "whether the purpose of the act of

state doctrine would be furthered by its application in this case."

<u>Id.</u> at 704.    Quoting <u>Sabbatino</u>, 84 S.Ct. at 937, the Court

described the act of state doctrine "as a consequence of domestic

separation of powers, reflecting 'the strong sense of the Judicial

Branch that its engagement in the task of passing on the validity

of foreign acts of state may hinder' the conduct of foreign
affairs." Id.  In addressing whether the purpose of the doctrine
would be furthered by its application courts assess three factors:
(1) the degree of consensus concerning a particular area of
international law, (2) the implications of the issue for the
United States' foreign relations, and (3) whether the government
that perpetrated the act(s) is still in existence. See Sabbatino,
84 S.Ct. at 940.

The burden of proving that the court should apply the act of
state doctrine is on the party asserting its applicability.  See
Alfred Dunhill of London, Inc. v. Republic of Cuba, 96 S.Ct. 1854,
1860-61 (1976).

(b)  Application of the Law to the Alleged Facts

Citing Kirkpatrick, 110 S.Ct. at 701, plaintiffs argue that
the act of state doctrine is not applicable because "the [c]ourt
need not pass on the legality of any acts taken by foreign
sovereigns in order to find the defendants liable for price
fixing."[21]  Alternatively, plaintiffs argue that the act of state
doctrine is not applicable because the price-fixing agreements for
which they seek redress run afoul of the doctrine's strict
territorial limitation and are purely commercial agreements subject
to a commercial activity exception.  For the reasons explained
below, the court concludes (1) that review of plaintiffs'

---

[21]Id.

-20-

allegations show that the factual predicate for applying the act of state doctrine identified in <u>Underhill</u> and <u>Kirkpatrick</u> exists, (2) that the purpose of the act of state doctrine would be furthered by its application, and (3) that neither a strict territorial limitation nor a commercial activity exception render the act of state doctrine inapplicable.

### (1)  Factual Predicate for Application

Review of the allegations asserted in the live complaints shows that the factual predicate for application of the act of state doctrine exists in this case because the acts that plaintiffs allege caused the price-fixing of RPPs in the United States for which they seek redress are governmental acts undertaken by recognized sovereigns within their own territory as required in <u>Underhill</u>, 18 S.Ct. at 85, and because the outcome of plaintiffs' claims, if allowed to continue, would turn upon the legality of those acts as required by <u>Kirkpatrick</u>, 110 S.Ct. at 704-05.

#### (i)  <u>Underhill</u> Requirements

##### (A)  Spectrum Complaint

The Spectrum Complaint expressly alleges

1.   This antitrust suit . . . arises out of the role of Defendant, CITGO . . . in **a conspiracy among the members of . . . OPEC . . . to raise, fix, and stabilize the price of gasoline and other oil-based products in the United States.  The primary elements of OPEC's . . . conspiracy are agreed-upon limits on the production of oil by OPEC's eleven member nations . . .** The avowed purpose and demonstrable effect of the cartel's

-21-

production limits is to raise, fix, and stabilize world oil prices above competitive levels, thus increasing the prices of gasoline and other oil-based products throughout the United States.[22]

The Spectrum Complaint alleges that

3. . . . **CITGO has** itself **joined** with members of OPEC as a willing participant in the price-fixing conspiracy. Specifically, CITGO has entered into an agreement with OPEC and its members **to facilitate, enable, and provide direct assistance to the cartel's price-fixing scheme.**[23]

The Spectrum Complaint alleges that CITGO has facilitated OPEC's

illegal price-fixing conspiracy by agreeing

20. . . . to provide the cartel, directly and through member nation Venezuela, with technical services and with information, such as information on the United States market and demand for oil products, that greatly assist OPEC in its effort **to fix the price of oil** at anticompetitive levels.

21. Members of CITGO's board of directors have participated directly in the development of OPEC's long-term strategy. . . [which] explicitly adopts as its objective **the unlawful maintenance of oil prices** by calling on OPEC members to take "proactive" measures to influence the "market" when prices become "too low."

22. . . . CITGO executives participate in the organization and operation of OPEC. . .

23. CITGO materially assists PDVSA's and Venezuela's participation in the cartel . . . For example, CITGO's former CEO Luis Marin acknowledged in 2003 that CITGO was "jointly analyzing" global oil markets **to assist Venezuela in maximizing the price it receives for its oil**. . .

. . .

---

[22]Spectrum Complaint, pp. 1-2 ¶ 1 (emphasis added).

[23]Id. at 2 ¶ 3 (emphasis added).

28.  CITGO has agreed to purchase huge quantities of Venezuelan oil pursuant to one-sided contracts that substantially assist Venezuela's participation in OPEC. . .[24]

The factual allegations in the Spectrum Complaint show that the antitrust conspiracy for which the plaintiffs seek redress is a conspiracy between sovereign states to limit the production of crude oil from their territories, and that CITGO's role in the alleged conspiracy is a supporting one.  Although the Spectrum Complaint alleges that CITGO "joined" the conspiracy,[25] the Spectrum Complaint does not allege that CITGO — like the foreign sovereign members of the conspiracy — produces crude oil.  Instead, CITGO is alleged to have "facilitate[d], enable[d], and provide[d] direct assistance to the cartel's price-fixing scheme"[26] by (1) purchasing crude oil produced by foreign sovereigns, (2) providing technical assistance to OPEC in the form of information about United States markets, and (3) allowing its executives to participate in OPEC's meetings and strategic planning efforts.  The Spectrum Complaint alleges that the price-fixing at issue is caused by the production decisions of the sovereign state members of the conspiracy:

30.  . . . Production increases and decreases by oil producers cause and determine changes in the prices of oil and refined oil products in the United States, including gasoline sold at the pump.

---

[24]Id. at 7-10 ¶¶ 20-28 (emphasis added).

[25]Id. at 2 ¶ 3.

[26]Id.

. . .

35.  . . . OPEC's production quotas are among the primary driving forces behind the seven-fold increase in the price of oil since 1998. . .

. . .

51.  Concerted production increases and decreases by OPEC members, with the active assistance of CITGO, directly affect and determine changes in the prices of gasoline and other oil-based products in the United States.  As a direct result of OPEC's production quotas, the price of oil on world markets has exceeded competitive levels. Concomitantly, the prices of oil and refined oil products in the United States, including gasoline and other oil-based products sold to Plaintiffs and members of the class, exceed the prices that would prevail in a competitive market, absent OPEC's artificially low production.

. . .

61.  . . . OPEC's production quotas are negotiated and agreed upon by and among its member nations . . .[27]

(B)  Consolidated Complaint

Unlike the Spectrum Complaint, which expressly identifies the "primary elements" of the alleged antitrust conspiracy as "agreed-upon limits on the production of oil by OPEC's eleven member nations"[28] and unambiguously describes defendant CITGO's actions as actions that "facilitate, enable, and provide direct assistance to the cartel's price-fixing scheme,"[29] the Consolidated Complaint is

---

[27]Id. at 10-20 ¶¶ 30-61.

[28]Id. at 1-2 ¶ 1 (emphasis added).

[29]Id. at 2 ¶ 3 (emphasis added).

-24-

artfully worded to limit reference to the actions performed by sovereign members of the conspiracy.  The Consolidated Complaint minimizes its description of the acts performed by the conspiracy's sovereign members.  For example, the Consolidated Complaint begins by alleging that the model pursuant to which crude oil is produced has "changed radically" over time:

> 2.   Originally, the foreign production of crude oil from which refined petroleum products are produced was based on a model where foreign governments granted concessions and leases to production companies to extract crude oil from the ground and then transport and refine it into familiar consumer products at the production companies' own commercial risk.   That is, there was a clear and definite line between, on the one hand, the foreign government's grant of permission to extract oil as a natural resource, and, on the other hand, the vast commercial operations that participated in the private business of creating and selling refined petroleum products.

> 3.   Over time, this model changed radically.  National oil companies no longer limited their operations to the granting of concessions to extract crude oil or to the extraction and marketing of crude oil.  Instead, national oil companies in the major oil-producing and exporting nations began sharing the commercial risk by partnering with and "acquiring" the production companies, and by expanding their operations into full-fledged, vertically integrated commercial businesses that make enormous profits from the sale of refined petroleum products.  The national oil companies have accomplished this by acquiring the infrastructure elements needed to transform crude oil into refined petroleum products, and to distribute and sell those refined petroleum products in the open market all over the world.  These foreign oil companies now own and operate facilities such as refineries, pipelines, shipping tankers, port facilities, and storage depots in far flung corners of the world, including here in the United States.  As a result, virtually all these former concession-granting public bodies now operate as multinational commercial

enterprises that refine and sell oil-based products in
the open market.[30]

Nevertheless, like the allegations contained in the Spectrum
Complaint, the allegations in the Consolidated Complaint show that
the price-fixing with respect to RPPs sold in the United States of
which plaintiffs complain is, in fact, caused by the production
decisions of the conspiracy's sovereign members:

> 5.  . . . One obvious method the conglomerates have used
> to raise the price of the refined petroleum products that
> they sell has been **to agree to reduce production of crude
> oil, the central component of refined petroleum
> products.**[31]

The Consolidated Complaint also alleges that

> 51.  . . . Defendants engaged in an unlawful continuing
> contract, combination and conspiracy in restraint of
> trade in violation of the Sherman Act to increase the
> price of RPPs sold in the United States. . .
>
> 52.  . . . **Defendants and their co-conspirators agreed to
> restrain the output and thereby fix the price of crude
> oil with the knowledge and intent that doing so would fix
> and increase the price of RPPs thereby producing supra-
> competitive profits from the sale of RPPs in the
> United States.**[32]

Moreover, where the Consolidated Complaint alleges specific facts,
those facts show that the antitrust conspiracy for which the
plaintiffs seek redress is an antitrust conspiracy like that
alleged in the Spectrum Complaint, i.e., a conspiracy that consists

---

[30]Consolidated Complaint, pp. 2-3 ¶¶ 2-3.

[31]Id. at 3-4 ¶ 5 (emphasis added).

[32]Id. at 15 ¶¶ 51-52 (emphasis added).

of agreements entered by foreign sovereign states to limit their production of crude oil.  These factual allegations also show that the actions attributed to the named defendants are actions that merely facilitate, enable, and assist the foreign sovereign state members of the conspiracy.

The Consolidated Complaint alleges that:

54. Defendants and their co-conspirators took the following actions and made the following statements constituting knowing participation in the conspiracy during the period 1986-2002:

. . .

G. On March 30, 1998, Saudi Aramco and PdVSA agreed with representatives of other co-conspirators to cut production of crude oil, thereby causing the prices charged for RPPs in the United States to be higher than they otherwise would have been.  In an official communique, OPEC stated:

"that **member countries have agreed** to voluntary cuts from each country's current production levels in an attempt to boost prices."

H. On June 24, 1998, Saudi Aramco, PdVSA and Lukoil agreed with representatives of other co-conspirators to cut production of crude oil, thereby causing the prices charged from RPPs in the United States to be higher than they otherwise would have been:

"**Together with promises from non-OPEC nations Russia, Oman and Mexico, world oil producers have pledged to cut world wide production** by approximately 3.1 million bpd [barrels per day]."

. . .

-27-

Q.   On November 7, 2002, Alvaro Silva Calderon, a representative of PdVSA, stated:

**"All countries have affirmed their commitment to the quotas. . ."**[33]

These excerpts from the Consolidated Complaint demonstrate that the collusive acts for which plaintiffs seek redress are not agreements made or even joined by the named corporate defendants but, instead, agreements made between foreign sovereign states to limit their production of crude oil.  Moreover, like the Spectrum Complaint, the Consolidated Complaint fails to allege that any named defendant either produces crude oil or functions as anything but a purchaser of crude oil produced by a foreign sovereign state at prices set by the foreign sovereign producer.

### (C)   Gokey Complaint

Like the Spectrum Complaint, the Gokey Statement of Claim seeks to hold CITGO liable pursuant to the Sherman and Clayton Acts for "[b]eing part of OPEC."[34]

### (D)   Conclusions

The plaintiffs' allegations demonstrate that the acts alleged to have caused the price-fixing of RPPs in the United States in all three live complaints are decisions of foreign oil producing states to restrict their crude oil production levels and to enter

---

[33]Id. at 16-19 ¶ 54.

[34]Included in Docket Entry No. 1 in Civil Action No. H-08-2745.

-28-

agreements with each other to do the same.  Allegations in the
three live complaints also demonstrate that the acts attributed to
defendants neither caused the foreign sovereign members of the
conspiracy to limit their production of crude oil, nor caused the
price-fixing of RPPs in the United States.  Instead, the defendants
are alleged merely to have helped the foreign sovereign members of
the conspiracy by (1) purchasing crude oil produced in their
territories, (2) providing technical assistance to OPEC in the form
of information about United States markets, and (3) allowing their
executives to participate in OPEC meetings and strategic planning
efforts.  Decisions of foreign sovereigns about production levels
of natural resources produced within their territorial boundaries
— including crude oil — are sovereign acts regardless of whether
the decisions are products of unilateral deliberation or
consultation with others.  See International Association of
Machinists v. The Organization of Petroleum Exporting Countries
(IAM I), 477 F.Supp. 553, 569 (C.D. Cal. 1979), aff'd on other
grounds, 649 F.2d 1354 (9th Cir. 1979), cert. denied, 102 S.Ct.
1036 (1982) ("The action of sovereign nations coming together to
agree on how each will perform certain sovereign acts can only,
itself, be a sovereign act.").  The court concludes that the
allegations in the three live complaints demonstrate that the
requirements for applying the act of state doctrine identified in
Underhill, 18 S.Ct. at 83, are satisfied because the acts that

plaintiffs allege caused the price-fixing of RPPs in the United States are governmental acts undertaken by recognized sovereigns within their own territories.

### (ii)   Kirkpatrick Requirement

In Kirkpatrick the Supreme Court held that the act of state doctrine did not apply unless a court in the United States would be required "to declare invalid the official act of foreign sovereign performed within its own territory . . ." 110 S.Ct. at 704. See discussion in Part II.B.1(a), infra. Plaintiffs argue that the Sherman Act allows courts to hold "[e]very person" who agrees to restrain trade . . . liable," 15 U.S.C. § 1, and that the Supreme Court's decision in Texas Industries, Inc. v. Radcliff Materials, Inc., 101 S.Ct. 2061 (1981), allows defendants to be held liable for participating in an antitrust conspiracy even though their co-conspirators have not all been named as defendants. Plaintiffs therefore argue that "the Court need not pass on the legality of any acts taken by foreign sovereigns in order to find the defendants liable for price fixing,"[35] but, instead, need look only to the acts of the named defendants to decide if the act of state doctrine applies in this case.

Texas Industries involved the right of a defendant found liable for violating the antitrust laws to seek contribution from

---

[35]Plaintiffs' Opposition at 25.

co-conspirators the plaintiff had not sued. Id. at 2066. Holding that if any such right existed its source must be federal common law, the Court declined to recognize such a right in antitrust cases. Id. at 2066-67. Plaintiffs cite Texas Industries for the well-established principle that complainants seeking relief for violation of the Sherman Act need not name as defendants all of the alleged conspirators. See State of Georgia v. Pennsylvania R.R. Co., 65 S.Ct. 716, 729 (1945) ("In a suit to enjoin a conspiracy not all the conspirators are necessary parties defendant."). But Texas Industries does not support plaintiffs' argument that the court need look only to the acts of the named defendants to decide if the act of state doctrine applies to their claims.

In Callejo v. Bancomer, S.A., 764 F.2d 1101 (5th Cir. 1985), the Fifth Circuit directed lower courts considering whether to apply the act of state doctrine not to restrict their analysis to the acts of the named defendants. The Callejo court explained that

> [r]ather than narrowly focusing on the status of the act and actor complained of, we examine more generally the underlying acts of the foreign state. In the act of state context, even if the defendant is a private party, not an instrumentality of a foreign state, and even if the suit is not based specifically on a sovereign act, we nevertheless decline to decide the merits of the case if in doing so we would need to judge the validity of the public acts of a sovereign performed within its own territory.

Id. at 1113 (citing Sabbatino, 84 S.Ct. at 940). In Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375 (5th Cir. 1992), the Fifth Circuit again directed lower courts analyzing applicability of the act of state doctrine not to look "only to the

acts of the named defendants, 'but [to look to] any governmental
acts whose validity would be called into question by adjudication
of the suit." Id. at 1387-88 (quoting Callejo, 764 F.2d at 1113.
See also Callejo, 764 F.2d at 1115 ("For act of state . . .
purposes, the relevant acts are not merely those of the named
defendants, but any governmental acts whose validity would be
called into question by adjudication of the suit.")).

Asserting that their claims arise not from the crude oil
production decisions of any foreign sovereign but, instead, from
the corporate defendants' agreements to facilitate those decisions,
plaintiffs seek to hold defendants liable for (1) purchasing crude
oil produced by foreign sovereign members of the conspiracy,
(2) providing technical assistance to OPEC in the form of
information about United States markets, and (3) allowing their
employees to participate in OPEC's meetings and strategic planning
efforts.  But plaintiffs have not alleged that the acts in which
defendants allegedly engaged are, alone, sufficient either to fix
the price of RPPs in the United States or to otherwise violate the
Sherman Act.  Therefore, an agreement by any defendant to assist
the foreign sovereign members of the alleged conspiracy to reach
and/or implement their crude oil production decisions could not
constitute a violation of the Sherman Act unless entering such an
agreement would also be a violation of the Sherman Act by the
foreign sovereigns.  The court thus concludes that plaintiffs'
claims cannot be resolved unless the court rules on the legality of

the decisions and agreements reached by the foreign sovereigns regarding the production of crude oil within their own territories. The court therefore concludes that the requirements for application of the act of state doctrine identified in <u>Kirkpatrick</u>, 110 S.Ct. at 701, are satisfied.

### (2)  Application and Furtherance of Purpose

Under the act of state doctrine "the acts of foreign sovereigns taken within their own jurisdictions **shall** be deemed valid." <u>Kirkpatrick</u>, 110 S.Ct. at 707. Plaintiffs argue that application of the act of state doctrine would neither preclude the court from holding the defendants liable for conspiring to violate the Sherman Act nor further the purposes of the doctrine.

### (i)  Application of the Act of State Doctrine

The act of state doctrine requires the court to treat as lawful the crude oil production decisions, and any intergovern-mental agreements pertaining thereto, made by the foreign sovereign members of the alleged conspiracy with respect to crude oil produced within their own territories. <u>Kirkpatrick</u>, 110 S.Ct. at 707. <u>See also</u> <u>Underhill</u>, 18 S.Ct at 84 ("Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained

through the means open to be availed of by sovereign powers as between themselves.").  Seeking to avoid this conclusion plaintiffs argue that the Supreme Court's decision in <u>United States v. Sisal Sales Corp.</u>, 47 S.Ct. 592 (1927), allows the court to hold the defendants liable "even if it is lawful, or beyond this Court's power to declare unlawful, for sovereign nations to agree upon production limits for crude oil."[36]  Plaintiffs argue that in <u>Sisal</u>, 47 S.Ct at 592, the Supreme Court "made clear, the act of state doctrine does not preclude courts from determining the legality of a conspiracy between nonsovereign actors, even though a foreign sovereign may have joined their conspiracy."[37]

In <u>Sisal</u>, 47 S.Ct. at 592, the defendants were accused of conspiring to monopolize the sisal trade between the United States and Mexico in violation of the Sherman Act by, <u>inter alia</u>, inducing Mexican officials to pass legislation that recognized members of the conspiracy as exclusive traders.  Citing the Supreme Court's decision in <u>American Banana Co. v. United Fruit Co.</u>, 29 S.Ct. 511 (1909), the district court dismissed the complaint for failure to state a claim.

In <u>American Banana</u> an American plaintiff sued an American defendant under the Sherman Act for instigating the government of Panama and/or Costa Rica to seize the plaintiff's railway and

---

[36]<u>Id.</u> at 26.

[37]<u>Id.</u>

plantation, thereby, damaging the plaintiff's ability to trade.  29
S.Ct. at 511-12.   In upholding the lower courts' dismissal, the
Supreme Court stated, "[w]e think it entirely plain that what the
defendant did in Panama or Costa Rica is not within the scope of
the statute so far as the present suit is concerned."  <u>Id.</u> at 513.
In support of this holding the Court cited <u>Underhill</u> for the
principle that "a seizure by a state is not a thing that can be
complained of elsewhere in the courts."  <u>Id.</u>  The Court explained
that

> [t]he fundamental reason why persuading a sovereign power
> to do this or that cannot be a tort is not that the
> sovereign cannot be joined as a defendant or because it
> must be assumed to be acting lawfully. . . The
> fundamental reason is that it is a contradiction in terms
> to say that, within its jurisdiction, it is unlawful to
> persuade a sovereign power to bring about a result that
> it declares by its conduct to be desirable and proper.
> It does not, and foreign courts cannot, admit that the
> influences were improper or the results bad.  It makes
> the persuasion lawful by its own act.  The very meaning
> of sovereignty is that the decree of the sovereign makes
> law.

<u>Id.</u>

Finding the facts in <u>Sisal</u> radically different from those
presented in <u>American Banana</u>, the Court in <u>Sisal</u> held that "the
doctrine there approved is not controlling here."  47 S.Ct. at 593.
The Court explained that the United States complained

> of a violation of their laws within their own territory
> by parties subject to their jurisdiction, not merely of
> something done by another government at the instigation
> of private parties.  True, the conspirators were aided by
> discriminating legislation, but by their own deliberate
> acts, here and elsewhere, they brought about forbidden

-35-

results within the United States.  They are within the jurisdiction of our courts and may be punished for offenses against our laws.

Id. at 594.

Despite plaintiffs' contentions to the contrary, Sisal did not involve a conspiracy between a private defendant and a foreign state.  Sisal involved allegations that the defendants, in further-ance of an antitrust conspiracy formed in and directed towards the United States, sought and received help from the Mexican government in the form of "discriminatory legislation."  47 S.Ct. at 593.  The Supreme Court concluded that dismissal was not required because "the defendant's actions in obtaining Mexico's enactment of 'discriminating legislation' could form part of the basis for suit under the United States antitrust laws."  Kirkpatrick, 110 S.Ct. at 706.  Although not expressly identified as a basis for the Court's opinion, the antitrust claims asserted against the defendants in Sisal could be resolved without a United States court having to rule on the legality of the Mexican legislation.  See Kirkpatrick, 110 S.Ct. at 704 ("In every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.").

The claims asserted in this action are distinguishable from those asserted in Sisal because for the reasons explained above the court has already concluded that the claims asserted here cannot be

resolved without the court having to rule on the legality of governmental acts and agreements that foreign sovereign members of the alleged conspiracy made with respect to crude oil production in their own territory.  Plaintiffs have cited no authority that would allow the court to hold the defendants liable under the Sherman Act for agreeing to assist foreign sovereigns make and effect lawful decisions and agreements regarding the production of their own crude oil.  Although plaintiffs' argue that they have alleged that defendants have conspired not just with foreign sovereigns but also with each other, this argument does not save their claims because the live complaints contain no factual allegations from which the court could plausibly conclude that collusive activity by the named defendants alone fixed the price of RPPs sold in the United States. See Twombly, 127 S.Ct. at 1965-66 (stating a claim under the Sherman Act's restraint of trade provision requires "a complaint with enough factual matter (taken as true) to suggest that an agreement was made").  Bare assertions of conspiracy are not enough to state a claim under the Sherman Act.

### (ii)  Furtherance of Purpose

Plaintiffs argue that even if the act of state doctrine is technically available, "the policies underlying the doctrine would nonetheless require the Court to refrain from applying the doctrine here, and instead to decide the plaintiffs' claims."[38]  Plaintiffs

---

[38]Id. at 41.

argue that adjudication of their claims would not conflict with the policies underlying the act of state doctrine because

> in prescribing the precise extraterritorial reach of the antitrust laws and the circumstances under which foreign sovereigns and their instrumentalities are to be protected from liability under American law through the FSIA [Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602-11], Congress and the Executive accounted fully for these policy considerations and directed the judiciary to resolve cases such as this one.[39]

This argument is based on plaintiffs' contention that "[t]he act of state doctrine should be construed to be no broader than the FSIA, lest the doctrine undermine Congress' intent in adopting the restrictive view of sovereign immunity."[40]  However, plaintiffs cite no authority for their contention, and the legislative history shows that the FSIA was intended to apply "only to the defense of sovereign immunity and does not extend to the act of state doctrine."[41]   See International Association of Machinists v. The Organization of Petroleum Exporting Countries (IAM II), 649 F.2d 1354, 1360 (9th Cir. 1979), cert. denied, 102 S.Ct. 1036 (1982) (recognizing that "the act of state doctrine and the doctrine of sovereign immunity address different concerns and apply in different circumstances").

---

[39]Id. at 42.

[40]Id. at 31 n.32.

[41]Defendants' Reply, p. 21 n.44 (quoting Exhibit 1 attached thereto, "Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcommittee on Administrative Law and Governmental Relations of the House Committee on the Judiciary, 94th Cong., 2d Sess. 34 (1976)).

Plaintiffs strenuously argue that the court need look only to the acts of the non-sovereign defendants in analyzing the defendants' act of state defense, but do not dispute that should the court decide otherwise, application of the act of state doctrine would further the doctrine's purposes because (1) the degree of consensus concerning this area of international law is low, (2) the implications of the issue for United States' foreign relations are significant, and (3) the governments that perpetrated the acts are still in existence.  See Sabbatino, 84 S.Ct. at 940.  See also IAM II, 649 F.2d at 1360-61 (recognizing that the lack of international consensus condemning production agreements, that availability of oil is a significant factor in international relations, and that the growing world energy crisis has been judicially recognized in other cases).

### (3)   Territorial Limitation and Commercial Activity Exceptions[42]

Plaintiffs argue that

[t]o the extent [their] claims implicate the acts of foreign nations, they fall within two different exceptions to the act of state doctrine.  The doctrine does not apply to conduct that is taken outside the territory of the foreign sovereign in question or to conduct that is commercial [in] nature.  Both of these

---

[42]The two arguments addressed in this section represent attempts by plaintiffs to recast requirements recognized by the Supreme Court in Underhill, 18 S.Ct. at 83, as "exceptions" under which the act of state doctrine does not apply.  For purposes of completeness, the court addresses them separately because they have been so treated in the parties' briefing.

exceptions apply here, making the [act of state] doctrine
wholly inapplicable.[43]

The court disagrees.

### (i)  Territorial Limitation

Citing <u>Kirkpatrick</u>, 110 S.Ct. at 704, plaintiffs argue that
the act of state doctrine does not apply to the facts alleged in
this case because

> the terms and aims of the conspiracy are established by
> agreements negotiated in Vienna and other locations
> outside the borders of any OPEC nation. . . .
> Importantly, it is only the price-fixing agreements
> themselves — not the production decisions by each OPEC
> nation within its own territory implementing the
> agreements — that would be subject to any declaration of
> illegality that might arguably be required.[44]

Plaintiffs argue that in <u>Kirkpatrick</u> the Supreme Court

> reiterated the territorial limitation on the scope of the
> doctrine [by stating that]:  "In every case in which we
> have held the act of state doctrine applicable, the
> relief sought or the defense interposed would have
> required a court in the United States to declare invalid
> the official act of a foreign sovereign performed *within
> its own territory*." . . .  The Court thus reaffirmed  the
> "traditional formulation" of the act of state doctrine,
> under which the doctrine applies only to "preclud[e] the
> courts of this country from inquiring into the validity
> of the public acts a recognized foreign sovereign power
> committed *within its own territory*."[45]

Citing <u>Allied Bank International v. Banco Credito Agricola de
Cartago</u>, 757 F.2d 516 (2d Cir.), <u>cert. dismissed</u>, 106 S.Ct. 30

---

[43]Plaintiffs' Opposition, pp. 22-23.

[44]<u>Id.</u> at 29.

[45]<u>Id.</u> at 27.

(1985), plaintiffs argue that "[a] foreign sovereign's acts occur within its territory 'only insofar as they [are] able to come to complete fruition within the dominion of the [foreign] government,"[46] and that

> [b]y contrast, "[a]cts of foreign governments purporting to have extraterritorial effect — and consequently, by definition, falling outside the scope of the act of state doctrine — should be recognized by the courts only if they are consistent with the law and policy of the United States.[47]

Allied Bank involved a dispute over a debt to be paid by Costa Rican banks in New York in United States dollars.   In response to the creditor's suit for default the banks asserted an act of state defense.   Analogizing the banks' default to a taking, the court stated that "[t]he extraterritorial limitation, an inevitable conjunct of the foreign policy concerns underlying the [act of state] doctrine, dictates that our decision herein depends on the situs of the property at the time of the purported taking." 757 F.2d at 521.   The court described the property at issue as Allied's right to receive payment from the Costa Rican banks. Citing the Fifth Circuit's decision in Tabacalera, 392 F.2d at 706, the court explained that

> [t]he act of state doctrine is applicable to this dispute only if, when the decrees were promulgated, the situs of the debts was in Costa Rica. . .

---

[46]Id. at 28 (quoting Tabacalera Severiano Jorge, J.A. v. Standard Cigar Co., 392 F.2d 706, 715-16 (5th Cir.), cert. denied, 89 S.Ct. 255 (1968)).

[47]Id.

As the Fifth Circuit explained in <u>Tabacalera</u>, the concept of situs of a debt for act of state purposes differs from the ordinary concept.  It depends in large part on whether the purported taking can be said to have "come to complete fruition within the dominion of the [foreign] government."  <u>Tabacalera</u>, 392 F.2d at 715-16.  In this case, Costa Rica could not wholly extinguish the Costa Rican banks' obligation to timely pay United States dollars to Allied in New York.  Thus the situs of the debt was not Costa Rica.

The same result obtains under ordinary situs analysis . . .

<u>Allied Bank</u>, 757 F.2d at 521.

Having decided that under either situs analysis, the situs of the debt was in the United States, not costa Rica, the court concluded that Costa Rica's default on the loan was not "a taking of property within its own territory." <u>Id.</u> at 522.  Plaintiffs argue that the Second Circuit's decision in <u>Allied Bank</u> shows that the act of state's application is subject to a strict territorial limitation.

The Second Circuit's decision in <u>Allied Bank</u> is premised on the well-settled principle that the act of state doctrine does not extend to takings of property located outside the territory of the acting state at the time of the taking.  <u>See</u> <u>Sabbatino</u>, 84 S.Ct. at 940-41 (limiting the act of state doctrine to takings of property "within its own territory by a foreign sovereign government").  <u>Allied Bank</u> does not support plaintiffs' argument that the act of state doctrine embodies a strict territorial limitation that precludes its application here.  To the contrary, citing <u>Sabbatino</u>, the <u>Allied Bank</u> court recognized that "[t]he Supreme Court has been

-42-

quite careful to avoid the creation of 'an inflexible and all-encompassing rule' to govern the application of the doctrine," 757 F.2d at 521, and observed that "[t]his analysis must always be tempered by common sense." Id.  Moreover, since the outcome of Allied Bank turned on the situs of the property at which the act of state was directed, and not the situs of the decision to act, Allied Bank does not support plaintiffs' argument that the act of state doctrine cannot apply to the crude oil production decisions and agreements of the sovereign state members of OPEC merely because those decisions and agreements are made in Vienna and elsewhere instead of within the sovereign states.  The court is not persuaded that the strict territorial limitation urged by the plaintiffs precludes application of the act of state doctrine to the sovereign acts at issue in this case.

(ii)  Commercial Activity Exception

Asserting that "[t]here can be no doubt that a conspiracy to fix the price of gasoline and other RPPs 'must be characterized as [a] commercial act . . . [because] i]t is typically private individuals rather than foreign states that indulge in this anticompetitive practice,"[48] plaintiffs contend that an exception to the act of state doctrine for purely commercial acts applies in this case.  A plurality of four justices proposed such an exception

---

[48]Id. at 35.

in Part III of the Supreme Court's opinion in <u>Dunhill</u>, 96 S.Ct. at
1861-67.

> At issue in <u>Dunhill</u> was
>
> whether the failure of respondents to return to
> petitioner Alfred Dunhill of London, Inc. (Dunhill),
> funds mistakenly paid by Dunhill for cigars that had been
> sold to Dunhill by certain expropriated Cuban cigar
> businesses was an "act of state" by Cuba precluding an
> affirmative judgment against respondents.

<u>Id.</u> at 1856.  The Court held that nothing in the record revealed an
act of state with respect to the respondents' obligation to return
funds mistakenly paid to them, but the justices were unable to
agree on the reason for the holding.  The plurality opinion argued
for recognition of a commercial activity exemption under which the
act of state doctrine would not apply to "the repudiation of a
purely commercial obligation owed by a foreign sovereign or by one
of its commercial instrumentalities." <u>Id.</u> at 1861.  Reasoning that
"the mere assertion of sovereignty as a defense to a claim arising
out of purely commercial acts by a foreign sovereign is no more
effective if given the label 'Act of State' than if it is given the
label 'sovereign immunity,'" <u>id.</u> at 1866, the plurality explained
the exception as a corollary of the commercial activity exception
to the sovereign immunity doctrine.  <u>Id.</u> at 1866-67 & n.18.  The
majority disagreed.  Reasoning that "[n]o statute, decree, order,
or resolution of the Cuban Government itself was offered in
evidence indicating that Cuba had repudiated its obligations in
general or any class thereof or that it had as a sovereign matter

-44-

determined to confiscate the amounts due three foreign importers,"
id. at 1861, the majority held that Cuba's actions in repudiating
a commercial debt were not invested with the sovereign authority of
the state and hence were not acts of state at all.  Id.

Apart from Dunhill, plaintiffs cite no judicial authority in
support of their argument that the act of state doctrine is
inapplicable under the facts of this case because the acts of which
they complain are purely commercial acts as opposed to sovereign —
i.e., governmental — acts.  The Fifth Circuit has cited Dunhill on
a number of occasions, but has never adopted the commercial
activity exception articulated in Dunhill's plurality opinion.  See
Callejo, 764 F.2d at 1115 n.17 ("Although we have cited Dunhill on
a number of occasions, . . . thus far we have not actually adopted
the commercial activity exception.").  Plaintiffs argue that in
Walter Fuller, 965 F.2d at 1375, the Fifth Circuit

> appears to have implicitly adopted this exception holding
> that, because the foreign sovereign's instrumentality had
> acted in its commercial capacity, its action was entitled
> to neither a declaration of validity under the act of
> state doctrine nor immunity under the FSIA [Foreign
> Sovereign Immunities Act].[49]

The court does not read Walter Fuller as so holding.  In
Walter Fuller the Fifth Circuit expressly declined to apply the act
of state doctrine after concluding that resolution of the claims
asserted therein did not require adjudication of the validity of
any governmental act.  Id. at 1387-88 (citing Kirkpatrick, 110

---

[49]Id. at 34 n.33.

S.Ct. at 701).   Because the plurality opinion in Dunhill lacks
binding precedential value, United States v. Robinson, 625 F.2d
1211, 1215 (5th Cir. 1980), and because the Fifth Circuit has never
adopted the commercial activity exception discussed therein,
Callejo, 764 F.2d at 1115 n.17, the court is not persuaded that
such an exception exists, or that if it does exist, its application
would be warranted in this case.

Moreover, even if a commercial activity exception to the act
of state doctrine did exist, the court is not persuaded that such
an exception would apply in this case.   According to plaintiffs
"[t]here can be no doubt that a conspiracy to fix the price of
gasoline and other RPPs 'must be characterized as [a] commercial
act . . . [because i]t is typically private individuals rather than
foreign states that indulge in this anticompetitive practice."[50]
However, as discussed in Part II.B.1(b)(1)(i), infra, the
conspiracy for which plaintiffs seek redress is a conspiracy formed
by foreign sovereigns to limit the production of crude oil within
their own boundaries that defendants have allegedly joined by
agreeing to facilitate, enable, and assist the foreign sovereigns.
Although plaintiffs allege that the "demonstrable effect of the
. . . production limits is to raise, fix, and stabilize world oil
prices above competitive levels, thus increasing the prices of
gasoline   and   other   oil-based   products   throughout   the

---

[50]Id. at 35.

United States,"[51] the only price-fixing **acts** alleged in the live complaints and, therefore, the only acts to which the court must look for deciding whether the acts at issue are commercial as opposed to sovereign, are the individual decisions of the foreign sovereign members of the alleged conspiracy on crude oil production levels and any purported agreements among them on that subject. Unlike the act of repudiating a debt at issue in Dunhill, the acts at issue here are inherently sovereign.   See United States v. California, 67 S.Ct. 1658 (1947) (exploitation of natural resources entails an exercise of powers peculiar to a sovereign).   See also IAM I, 477 F.Supp. at 567-68 (identifying exercise of control over natural resources as exercise of sovereignty).   Since plaintiffs allege that the prices of RPPs sold in the United States are fixed by the agreements of foreign sovereigns to increase and decrease the level of crude oil produced within their own territories, and defendants' liability is premised on alleged acts that facilitate, enable, and assist the foreign sovereign members of the alleged conspiracy to reach and carry out their production level decisions, the court concludes that plaintiffs' claims, properly characterized, challenge the acts and agreements pursuant to which the prices of RPPs are fixed, i.e., the acts and agreements of the foreign sovereign members of the alleged conspiracy to restrict crude oil production within their boundaries.   Decisions of foreign

---

[51]Spectrum Complaint at pp. 1-2 ¶ 1 (emphasis added).

-47-

sovereigns regarding production levels of natural resources — including crude oil — are inherently sovereign acts regardless of whether those decisions are products of unilateral deliberation or consultation with others.  See IAM I, 477 F.Supp. at 569 ("The action of sovereign nations coming together to agree on how each will perform certain sovereign acts can only, itself, be a sovereign act.").  Accordingly, the court concludes that regardless of whether the acts at issue in this case are properly identified as the crude oil production decisions of foreign sovereign states or the allegedly collusive intergovernmental agreements pursuant to which their crude oil production decisions are reached, application of the commercial activity exception proposed by the Dunhill plurality is unwarranted because the acts of which plaintiffs complain are inherently sovereign — as opposed to "purely commercial" — in nature.

(c)  Conclusions

For the reasons explained above, the court concludes (1) that review of plaintiffs' allegations show that the factual predicate for applying the act of state doctrine identified in Underhill and Kirkpatrick exists, (2) that the purpose of the act of state doctrine would be furthered by its application, and (3) that neither a strict territorial limitation nor a commercial activity exception render the act of state doctrine inapplicable.

2.   <u>Political Question Doctrine</u>

Defendants argue that "plaintiffs' claims present a non-justiciable political question"[52] because they ask the court "to judge the legality of the sovereign oil production decisions of oil-producing nations."[53]  Plaintiffs counter that their claims do not raise a non-justiciable political question because they do not challenge "the decisions of any of the sovereign states . . . to restrict the production of crude oil located within its own territory,"[54] but instead challenge only "the existence of a price-fixing conspiracy acting in U.S. commerce that transcends any possible conception of sovereign states making decisions about their natural resources."[55]

Plaintiffs' claims can only be assessed in light of the acts and agreements alleged in the live complaints.  <u>See</u> <u>Twombly</u>, 127 S.Ct. at 1965-66 (describing the pleading requirements for Sherman Act claims).  For reasons explained in Part II.B.1(b)(1)(i), <u>infra</u>, the court has concluded that the three live complaints allege that the acts and agreements that caused the prices of RPPs in the United States to be fixed are the decisions of foreign oil producing states to restrict their crude oil production levels and

---

[52]Defendants' Motion to Dismiss, p. 11.

[53]<u>Id.</u>

[54]Plaintiffs' Opposition, p. 1.

[55]<u>Id.</u>

enter agreements with each other to do so, and that these decisions and agreements are governmental acts undertaken by recognized sovereigns within their own territories.  The court has thus concluded that the plaintiffs' claims challenge the decisions of sovereign states to restrict the production of crude oil located within their own territories.  For the reasons explained below, the court concludes that the plaintiffs' claims raise a non-justiciable political question.

(a)  Applicable Law

The political question doctrine emerges out of the "case or controversy" requirement of Article III of the United States Constitution and has its roots in separation of powers concerns. See Baker, 82 S.Ct. at 706-07.  See also Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).  While cautioning that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," id. at 707, the Court acknowledged that judicial scrutiny of foreign relations decisions involves

> discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

Id.  The Court identified six factors, any one of which indicates the presence of a nonjusticiable political question:  (1) a textually demonstrable commitment of the issue to a coordinate

political department; (2) a lack of judicially discoverable and
manageable standards; (3) the impossibility of deciding without an
initial policy determination of a kind clearly for nonjudicial
discretion; (4) the impossibility of a court's undertaking
independent resolution without expressing lack of the respect due
coordinate branches of government; (5) an unusual need for
unquestioning adherence to a political decision already made; or
(6) the potentiality of embarrassment from multifarious
pronouncements by various departments on one question. Id. at 710.
Defendants argue that all six Baker factors are present in this
case.[56]   Plaintiffs argue that none are present.[57]   The court
concludes that the plaintiffs' claims present a nonjusticiable
political question because the fourth Baker factor is clearly
implicated:  the adjudication of claims that require the court to
determine the legality of crude oil production decisions of foreign
sovereigns would express a lack of respect for the Executive Branch
because of its longstanding foreign policy that issues relating to
crude oil production by foreign sovereigns be resolved through
intergovernmental negotiation.

> (b)  Application of Law to the Facts

The fourth Baker factor requires the court to consider whether
it would be possible to decide this case without expressing a lack

---

[56]Defendants' Motion to Dismiss, pp. 12-24.

[57]Plaintiffs' Opposition, pp. 10-22.

of respect for the Executive Branch's handling of foreign relations. Id. The fourth Baker factor applies to this case because, contrary to plaintiffs' arguments, adjudication of their claims would indicate a lack of respect for the Executive Branch's preferred approach to handling issues arising from the crude oil production decisions of foreign sovereigns. The United States has long recognized the importance of maintaining reliable supplies of crude oil as a significant component of national security. The United States government has never chosen to seek antitrust sanctions against any oil-producing sovereign but has, instead, steadfastly chosen to pursue a policy of cooperation and constructive diplomacy. Attached to defendants' motion to dismiss is a Chronology of the International Oil Policy of the United States ("Chronology").[58] Undisputed by the plaintiffs, the Chronology summarizes over thirty years of public policy statements made by members of the Executive Branch, all reflecting a commitment to cooperation instead of confrontation with foreign sovereign oil-producers. See Norris, 500 F.3d at 461 n.9 (recognizing that courts may permissibly refer to matter of public record when deciding a Rule 12(b)(6) motion). Adjudication of plaintiffs' claims by this court would not only threaten to disrupt the operation of longstanding diplomatic relationships nurtured by the Executive Branch across decades, but would also threaten to

---

[58]Exhibit 13 submitted with Defendants' Motion to Dismiss.

undermine the constitutional responsibility of the Executive Branch to conduct foreign affairs.

For example, one of the remedies that plaintiffs seek is an injunction ordering companies wholly owned by foreign sovereign oil producers to divest their United States subsidiaries. As recognized by the Ninth Circuit in IAM II

> [t]he possibility of insult to the OPEC states and of interference with the efforts of the political branches to seek favorable relations with them is apparent from the very nature of this action and the remedy sought. While the case is formulated as an anti-trust action, the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources. On the other hand, should the court hold that . . . [the foreign sovereigns'] actions are legal, this "would greatly strengthen the bargaining hand" of the OPEC nations in the event that Congress or the executive choose to condemn OPEC's actions.

649 F.2d at 1361. "Courts should not enter at the will of litigants into a delicate area of foreign policy which the executive and legislative branches have chosen to approach with restraint." Id.

> (c) Conclusions

Because the Executive Branch has long adhered to a policy of pursuing diplomatic efforts by the United States with oil-producing nations, the court concludes that the fourth Baker factor applies to this case and that adjudication of plaintiffs' claims would indicate a lack of respect for the Executive Branch's preferred approach to handling issues arising from the crude oil production decisions of foreign sovereigns.

    3.   <u>International   Comity   Doctrine,   Indirect   Purchaser
Doctrine, and the Noerr-Pennington Doctrine</u>

Because the court has concluded that plaintiffs' claims are subject to dismissal under the act of state and political question doctrines, the court declines to consider the defendants' arguments that the plaintiffs' claims are also subject to dismissal under the international comity doctrine, the indirect purchaser doctrine, and the <u>Noerr-Pennington</u> doctrine.

### III.  **Conclusions and Order**

For the reasons explained above, the court concludes that the claims that plaintiffs have asserted are subject to dismissal under the act of state doctrine and the political question doctrine. Accordingly, Served Defendants' Motion to Dismiss (Docket Entry No. 106 in Civil Action H-06-03569, Docket Entry No. 136 in Civil Action H-07-04409, Docket Entry No. 115 in Civil Action H-07-04413, Docket Entry No. 60 in Civil Action H-07-04434, and Docket Entry No. 53 in Civil Action H-08-00241) is **GRANTED.**

**SIGNED** at Houston, Texas, on this 9th day of January, 2009.

 

_____

SIM LAKE

UNITED STATES DISTRICT JUDGE